ROBERT S. SHWARTS (SBN 196803)
rshwarts@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
The Orrick Building
405 Howard Street
San Francisco, CA  94105-2669
Telephone:  (415) 773-5700
Facsimile:  (415) 773-5759

LILLIAN J. MAO (SBN 267410)
lmao@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
1000 Marsh Road
Menlo Park, CA  94025-1015
Telephone:  (650) 614-7400
Facsimile:  (650) 614-7401

TIMOTHY P. FOX (SBN 157750)
tfox@creeclaw.org
CIVIL RIGHTS EDUCATION AND
ENFORCEMENT CENTER
1245 E. Colfax Avenue, Suite 400
Denver, CO 80218
Telephone:  (303) 757-7901
Facsimile: (303) 872-9072

MARIA DEL PILAR GONZALEZ
MORALES (SBN308550)
pgonzalez@creeclaw.org
CIVIL RIGHTS EDUCATION AND
ENFORCEMENT CENTER
1825 N. Vermont Avenue, #27916
Los Angeles, CA 90027
Telephone:  (805) 813-8896
Facsimile:  (303) 872-9072

*Attorneys for Plaintiffs*

## IN UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

E.A.R.R.; G.S.E.R, A MINOR CHILD, by and through his mother and NEXT FRIEND, E.A.R.R; B.A.E.R., A MINOR CHILD, by and through his mother and NEXT FRIEND, E.A.R.R; L.Y.G.; H.A.H.G.; J.A.E.M; Y.J.C.E, A MINOR CHILD, by and through his mother and NEXT FRIEND, J.A.E.M.; S.F.L.; C.J.M.L., A MINOR CHILD, by and through his mother and NEXT FRIEND, S.F.L.; Y.M.M.; J.C.M.M., A MINOR CHILD, by and through her mother and NEXT FRIEND, Y.M.M.; G.F.F.; M.Y.J.L.; M.M.G., A MINOR CHILD, by and through his mother and NEXT FRIEND, V.A.G.; D.Y.S., A MINOR CHILD, by and through his mother and NEXT FRIEND, M.S.S.; S.M.A., A MINOR CHILD, by and through her mother and NEXT FRIEND, K.A.M.; D.G.M.; N.R.R.; H.H.M.; E.H.M.; C.J.V.C., A MINOR CHILD, by and through his mother and NEXT FRIEND, M.C.; La.V.S.O., A MINOR CHILD, by and through her mother and NEXT FRIEND, A.A.F.S.O; and, AL OTRO LADO, an organization,

Plaintiffs,

Case No. **'20 CV 2146 TWR BGS**

**CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

1        v.

2 U.S. DEPARTMENT OF HOMELAND
   SECURITY ("DHS"); CHAD WOLF,

3 Acting Secretary of The Department of
   Homeland Security, in his official

4 capacity; U.S. CUSTOMS AND
   BORDER PROTECTION ("CBP"); and

5 MARK A. MORGAN, Acting
   Commissioner of U.S. Customs and

6 Border Protection, in his official
   capacity,

7
             Defendants.

8

1      1.     Named Plaintiffs[1] are men, women, and children who represent putative classes of migrants with disabilities and health conditions and their family members whom the Department of Homeland Security ("DHS") and its sub-component Customs and Border Protection ("CBP") have forcibly returned to Mexico under the so-called Migrant Protection Protocols (the "MPP"). Defendants' own policies categorically prohibit placing people with "mental or physical health issues in the MPP." This is far from accidental. Instead, the brutal practice of ignoring this policy, refusing disability accommodations, and sending people with disabilities to survive in makeshift refugee camps and shelters in Mexico is widespread. The risk of harm to people with disabilities in this program is imminent, substantial, and irreparable. Countless individuals have tried and failed to overcome the everyday deprivations of water, sanitation, medicine, and reasonable aids in order to prepare and present their cases in inaccessible courts without basic accommodations.

2.     Prior to being placed in the MPP, CBP takes a recently arrived immigrant into custody and detains them in a CBP processing center. As a result of this process, Defendants knew or should have known during Plaintiffs' time in CBP custody that Plaintiffs or their family member had physical or mental health

---

[1] A motion to proceed under anonymity is forthcoming. In this case, Plaintiffs assert multiple facts that support proceeding with anonymity. They (1) face imminent threats from anti-immigrant groups in Northern Mexico; (2) disclose information of the utmost intimacy about the physical abuse and discrimination that could subject them to being ostracized; and (3) face potential retaliation from port officials, who have threatened to label as "terrorists" other migrants who peacefully raised public awareness of their plight, an action that would bar that person from receiving asylum. These factors counsel in favor of proceeding anonymously. *Does I thru XXIII v. Advanced Textile Corp.*, 214 F.3d 1058, 1067-68 (9th Cir. 2000) (party may preserve anonymity in judicial proceedings when "special circumstances justify" this treatment – *i.e.*, when the plaintiff's need for anonymity outweighs prejudice to the [Defendants] and the public's interest in knowing [Plaintiff's] identity"); *see also Al Otro Lado, Inc. v. Nielsen*, No. 17-cv-02366-BAS-KSC, 2017 WL 6541446, at *1 (S.D. Cal. Dec. 20, 2017) (granting anonymity to asylum seekers who brought suit against the government for denying them access to the U.S. asylum system through unlawful policies and practices). Moreover, ten of the plaintiffs are minor children and the Federal Rules of Civil Procedure require redaction of the names of minor children. Fed. R. Civ. Proc. 5.2(a) ("In an electronic or paper filing with the court that contains . . . the name of an individual known to be a minor, . . . the filing may include only . . . the minor's initials"). Plaintiffs will disclose their identities to the representatives of Defendants.

CLASS ACTION COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

conditions, including disabilities. Plaintiffs' conditions are open and obvious, well documented, and/or were repeatedly reported to CBP agents. Further, Defendants are obligated to put in place screening procedures to identify people with disabilities.

3.    Defendants have utterly failed to establish mechanisms to ensure that its agents follow Defendants' policies, including exempting migrants with physical or mental health conditions from the MPP. As a result, Defendants' employees or agents subjected Plaintiffs to the MPP, forcing them to return to Mexico pending their immigration proceedings and any appeals.

4.    As a result of Defendants' actions, Plaintiffs and putative class members in Mexico do not have sufficient shelter, are denied essential medical equipment and care, and/or face barriers such as inaccessible buildings and facilities, a lack of sign language interpreters, and a lack of effective communication, all of which substantially affect their ability to prepare for and adequately aid in their defense in removal proceedings.

5.    Further, Defendants send Plaintiffs and members of the class— sometimes completely without warning—to areas in Mexico for which the Department of State has given the highest travel warning due to rampant murder, armed robbery, carjacking, kidnapping, extortion, and sexual assault, and to some areas where the Department of State warns U.S. citizens that local law enforcement is not capable of protecting them. This is particularly harmful to Plaintiffs and members of the putative class, who are especially vulnerable to persecution, torture, and human trafficking in Mexico.

6.    As a result of these conditions, Plaintiffs and putative class members cannot meaningfully prepare for or participate in removal proceedings, including asserting any defenses to removal to another country claims. For example, Plaintiffs are forced to divert their time, energy, and resources to attempt to obtain—sometimes unsuccessfully—basic medical equipment and care, making it virtually impossible for them to meaningfully assert defenses to removal or otherwise prepare for removal

proceedings.

7. Despite repeated pleas from Plaintiffs and advocates, and despite clear evidence of harm, Defendants continue to refuse to exempt Plaintiffs and members of the class from the MPP notwithstanding that their own policies and applicable laws require them to do so.

8. Plaintiffs seek a declaration that Defendants' actions violate the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq*., and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, and seek an order enjoining Defendants from continuing to subject Plaintiffs and putative class members to the MPP, and requiring Defendants to put in place practices and procedures to satisfy their obligations under Section 504.

## I.    PARTIES

### A.    The Plaintiffs

9. Plaintiff E.A.R.R. is a thirty-four-year old woman and is a qualified individual with a disability. Doctors diagnosed her with a pituitary tumor that presses against her brain. Since on or about May 22, 2019, Defendants have forced her to remain in Mexico under the MPP with her two children, including G.S.E.R.

10. Plaintiff G.S.E.R. is a thirteen-year-old child and is a qualified individual with a disability. G.S.E.R. has only one functioning lung. Since on or about May 22, 2019, Defendants have forced him to remain in Mexico under the MPP.

11. Plaintiff B.A.E.R. is twelve-year-old child and is the child and sibling of people with disabilities (E.A.R.R. and G.S.E.R.). Since on or about May 22, 2019, Defendants have forced him to remain in Mexico under the MPP.

12. Plaintiff L.Y.G. is a thirty-six-year-old woman and is a qualified individual with a disability. Doctors diagnosed her with scoliosis and kidney stones. She has Post-Traumatic Stress Disorder, high blood pressure, and high glucose levels. Since on or about February 5, 2020, Defendants have forced her and her two

CLASS ACTION COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

children to remain in Mexico under the MPP.

13.    Plaintiff H.A.H.G. is a forty-five-year-old man and is a qualified individual with a disability. H.A.H.G. has an inguinal hernia, a kidney cyst, a dislocated spinal disc, and hearing loss. Since on or about June 22, 2019, Defendants have forced him and his sons to remain in Mexico under the MPP.

14.    Plaintiff Y.J.C.E is a seven-year-old child and is a qualified individual with disabilities. He has been diagnosed with a heart murmur. Since on or about October 29, 2019, Defendants have forced him and his family, including his mother J.A.E.M., to stay in Mexico under the MPP.

15.    Plaintiff J.A.E.M. is a thirty-eight-year-old woman and is the mother of a person with disabilities (Y.J.C.E.). Since on or about October 29, 2019, Defendants have forced her and her family to stay in Mexico under the MPP.

16.    Plaintiff S.F.L. is a forty-seven-year-old woman and is a qualified individual with disabilities. She has diabetes, vision loss, and depression. Since on or about July 16, 2019, Defendants have forced her and her son, C.J.M.L., to remain in Mexico under the MPP.

17.    Plaintiff C.J.M.L. is an eight-year-old boy and is a qualified individual with disabilities. He has a urethral malformation that requires surgery. Since on or about July 16, 2019, Defendants have forced him and his mother, S.F.L., to remain in Mexico under the MPP.

18.    Plaintiff Y.M.M. is a thirty-nine-year-old woman and is mother of a person with disabilities (J.C.M.M.). Y.M.M. is being assessed for mental health issues. Since on or about March 27, 2020, Defendants have forced Y.M.M. and her child to remain in Mexico under the MPP.

19.    Plaintiff J.C.M.M. is a seven-year-old child and is a qualified individual with disabilities. She has urinary tract problems, experiences seizures, and has a mild intellectual disability. Since on or about March 27, 2020, Defendants have forced her and her mother, Y.M.M., to remain in Mexico under the MPP.

CLASS ACTION COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

20. Plaintiff G.F.F. is a thirty-eight-year-old man, and is a qualified individual with a disability. He has depression and insomnia. Since around July 2019, Defendants have forced him to remain in Mexico under the MPP.

21. Plaintiff M.Y.J.L. is a thirty-four-year-old woman and is a qualified individual with disabilities. She has debilitating uterine fibroids, also known as myomas and endometriosis. These conditions cause her to experience intense pain and bleeding. Since on or about March 13, 2020, Defendants have forced her and her husband to remain in Mexico under the MPP.

22. Plaintiff M.M.G. is a sixteen-year-old boy and is a qualified individual with a disability. He has a brain injury arising from surgery to reconstruct a brain blood vessel, and he experiences painful headaches, impaired memory, and confusion. Since on or about September 26, 2019, Defendants have forced him and his family, including his mother, V.A.G., to stay in Mexico.

23. Plaintiff D.Y.S. is a nine-year-old child and is a qualified individual with a disability. Doctors have diagnosed him with autism, hyperactivity, and epilepsy. Since on or about November 22, 2019, Defendants have forced him and his mother, M.S.S., to remain in Mexico under the MPP.

24. Plaintiff S.M.A. is a seven-year-old child and is a qualified individual with a disability. Doctors diagnosed her with lissencephaly, a disorder characterized by developmental delay and seizures. Since on or about August 23, 2019, Defendants have forced her and her mother, K.A.M., to remain in Mexico under the MPP.

25. Plaintiff D.G.M. is a fifty-two-year-old man and is a qualified individual with a disability. He has hypertension and a growth in his heart that requires a pacemaker. Since on or about July 28, 2019, Defendants have forced him and his family to remain in Mexico under the MPP.

26. Plaintiff N.R.R. is a forty-four-year-old woman and the wife of a person with disabilities (D.G.M.). Since on or about July 28, 2019, Defendants have forced her and her family to remain in Mexico under the MPP.

CLASS ACTION COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

27.    Plaintiff H.H.M. is a twenty-year-old man and is a qualified individual with a disability. He is deaf and does not communicate through any standardized sign language. He relies on his sister, E.H.M., almost exclusively for communication. Since on or about March 21, 2020, Defendants have forced him and his family to remain in Mexico under the MPP.

28.    Plaintiff E.H.M. is a twenty-two-year-old woman and is the sister of person with disabilities (H.H.M.). Since on or about March 21, 2020, Defendants have forced her, her child, and her brother to remain in Mexico under the MPP.

29.    Plaintiff C.J.V.C. is a fourteen-year-old child and is a qualified individual with a disability. He has an amputated leg. Since on or about September 24, 2019, Defendants have forced him and his mother, M.C., to remain in Mexico under the MPP.

30.    Plaintiff La.V.S.O. is a one-year-old baby and is a qualified individual with a disability. She was born with congenital hydrocephalus, which causes a buildup of fluid around her brain and spinal cord and requires specialized medical treatment. Since on or about February 27, 2020, Defendants have forced her and her family, including her mother A.A.F.S.O., to remain in Mexico under the MPP.

31.    Al Otro Lado is a non-profit, binational legal services organization incorporated in California. Al Otro Lado serves indigent deportees, migrants, refugees and their families, principally in Los Angeles, California and Tijuana, Mexico. In both locations, the populations that Al Otro Lado serves includes many individuals with disabilities or who are seriously ill, as well as their families. The volume of individuals with disabilities or medical conditions subjected to the MPP requiring Al Otro Lado's assistance has forced Al Otro Lado to expend significant additional time and effort, affecting the organization's activities and staffing, frustrating its mission, and requiring it to divert its resources.

**B.    The Defendants**

32.    Defendant U.S. Department of Homeland Security ("DHS") is a

CLASS ACTION COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

Department within the Executive Branch tasked with enforcing the immigration laws of the United States.

33.     Defendant Chad Wolf is or was the purported Acting Secretary of DHS at all times relevant to this suit and is sued in his official capacity. Defendant Wolf is responsible for the administration, implementation, and enforcement of U.S. immigration laws and policies pursuant to 8 U.S.C. § 1103(a), including policies related to the forcible return of asylum-seekers to Mexico at the U.S. southern border.

34.     Defendant U.S. Customs and Border Protection ("CBP") is the sub-agency of DHS that is responsible for enforcement operations along the borders of the United States, including the U.S. southern border.

35.     Defendant Mark A. Morgan is the Acting Commissioner of CBP and is sued in his official capacity. Defendant Morgan oversees the apprehension and detention of individuals, including asylum seekers, who enter the United States at or near the U.S. border.

## II.     JURISDICTION AND VENUE

36.     This case arises under the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.*, and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794.

37.     The Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343, 1346, 2201-2202; 29 U.S.C. § 794a; and 5 U.S.C. § 702.

38.     Venue is proper under 28 U.S.C. § 1391(e) because a substantial part of the acts or omissions occurred in the Southern District of California.

## III.     LEGAL FRAMEWORK

### A.     Section 240 Proceedings

39.     The Immigration and Naturalization Act ("INA") provides different proceedings for different categories of individuals to determine their admissibility to the United States.

40.     The proceedings relevant to this case are set forth in section 240 of the

CLASS ACTION COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

INA, as well as any appeals as of right therefrom including petitions for review, collectively referred to herein as "Section 240 proceedings." Section 240 is codified at 8 U.S.C. § 1229a. Appeals as of right from those proceedings are discussed in 8 C.F.R. § 1003.1. Petitions for review to Circuit Court of Appeals (included in the term "appeals as of right" for the purposes of this complaint) are discussed in 8 U.S.C. § 1252.

41.    Section 240 proceedings are evidentiary hearings presided over by an immigration judge.

42.    Through this, individuals, who are respondents in these proceedings, are given the opportunity to examine evidence brought against them, to present evidence, and to cross-examine witnesses. 8 U.S.C. § 1229a(b)(4).

43.    The respondent has the burden of proof on most issues, and in determining whether that burden has been met, an immigration judge focuses on whether the respondent has submitted credible, persuasive, specific facts. 8 U.S.C. § 1229a(c)(2). Any evidence submitted by the noncitizen must comply with applicable requirements. 8 U.S.C. § 1229a(c)(3).

44.    A respondent who does not appear for a scheduled Section 240 proceeding faces a significant risk that the immigration judge will order their removal. 8 U.S.C. § 1229a(b)(5).

45.    Appeals as of right, which include appeals to the Board of Immigration Appeals and petitions for review for the purposes of this complaint as indicated above, involve review of the factual and legal findings of the agency through briefs, occasionally including oral argument. A respondent who does not file briefs on appeal faces a significant risk of having an appeal as of right dismissed.

**B.    The Migrant Protection Protocols**

46.    The MPP, introduced in December 2018, is a policy of the Trump administration that purports to grant CBP officers the authority to return to Mexico people seeking admission to the United States, pending their Section 240

CLASS ACTION COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

proceedings.[2]

47. As of March 2020, Defendants had forcibly returned more than 60,000 people to Mexico pursuant to the MPP. Approximately 25,000 of these individuals live in makeshift camps and shelters in Mexican border towns.

48. Individuals placed in the MPP are in Section 240 proceedings. The process of pursuing Section 240 proceedings under the MPP is itself a grueling exercise. Immigration court respondents who are set for morning proceedings must travel through extremely dangerous, sometimes cartel-controlled areas, to present themselves to CBP agents at the Port of Entry before sunrise. Those set for the afternoon docket often are not released back into Mexico until late in the evening, often after sunset. Section 240 proceedings usually entail a series of court appearances, culminating in a final merits hearing. As a result, prior to receiving an immigration judge's determination on the merits of their cases, Plaintiffs and others in the MPP must often present themselves for court many times.

49. Respondents in MPP proceedings must first pass a medical inspection before being permitted to enter immigration court. Some individuals have been turned away and rescheduled because, for example, abysmal living conditions have caused them to have lice. After their belongings are inspected, individuals often wait hours in holding areas before being called for their proceedings.

50. At San Diego and El Paso, MPP court proceedings are held in the San Diego and El Paso immigration courts in person, where asylum-seekers interact with court staff or officials and, when possible, submit documents in person. Once an asylum seeker is permitted to enter the court, that person is prohibited from exercising any freedom of movement.

51. At Brownsville and Laredo, Texas, MPP court proceedings are

---

[2] Plaintiffs, including members of the putative class, who entered the United States without inspection and were apprehended by CBP agents thereafter, do not concede that the INA permits CBP to return them to a contiguous country pending removal proceedings by filing this suit.

CLASS ACTION COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

conducted in temporary "tent" facilities erected on federal property near the ports of entry. These facilities are not easily accessible for individuals with mobility disabilities, such as C.V.J.C. Those who attend courts at these facilities do not come face-to-face with any court staff or officials; instead, asylum-seekers interact with the immigration judge and government attorneys entirely over televideo. Individuals who have documents to submit to the court must hand the documents to a security guard to scan. While waiting for others to finish proceedings with the judge, immigrants are not given any freedom of movement and must ask for and be granted permission to use restroom facilities. When appearing for the merits portion of their immigration proceeding, individuals are placed into a repurposed shipping container that is barely big enough to hold three people. Interpreters are not physically present for the interviews. Instead, if interpretation is needed, respondents speak through an interpreter over the phone.

52.    After proceedings are concluded, depending on several factors, including whether someone has been granted a *non-refoulement* interview, people can wait another several hours, incommunicado, before being returned to Mexico.

53.    The heightened risk of abuse or crimes and the conditions that people with disabilities face in Mexico—including lack of medical care, medical equipment, accessible housing and buildings, sign language interpreters, and other necessary supports—are appalling.

54.    As a result, people with disabilities that Defendants force to return to Mexico often must focus all their efforts on simply surviving. They have no meaningful opportunity to prepare for their Section 240 proceedings. In fact, people with disabilities run the risk of not even being able to appear at their 240 proceedings because of their disabilities.

55.    DHS, apparently recognizing that the MPP should not be applied to people with disabilities, has expressly excluded people with known physical or mental health issues from the MPP in its policies (the "Physical/Mental Health

CLASS ACTION COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

Exclusion").

56.     Among other places, the Physical/Mental Health Exclusion is set forth on a DHS webpage entitled "Migrant Protection Protocols," last published on August 10, 2020. In a section of this webpage entitled "Are there any exclusions to who is subject to MPP?" DHS explicitly states that people with "[k]nown physical/mental health issues" are excluded from the MPP.[3]

57.     On several other occasions—including in a brief to the Ninth Circuit[4] and a statement of "Guiding Principles" applicable to the MPP at all ports of entry[5]— DHS and CBP have made it clear that the MPP should not be applied to people with known physical or mental health issues.

58.     Notwithstanding DHS and CBP's stated policy that the MPP should not apply to people with known physical or mental health issues, CBP continues to apply the MPP to such people, returning Plaintiffs and numerous other people with physical or mental health conditions, including people with disabilities, to Mexico.

59.     On information and belief, DHS has not put in place effective mechanisms to ensure that CBP employees implement its policy exempting people with known physical or mental health conditions from the MPP, and has failed to put in place mechanisms to identify or assess, for purposes of accommodations, immigrants with disabilities.

---

[3] *Migrant Protection Protocols*, DEP'T OF HOMELAND SEC., https://www.dhs.gov/migrant-protection-protocols (last visited Nov. 2, 2020).

[4] *See* Br. for Appellants at 13, *Innovation Law Lab v. McAleenan*, 2019 WL 2290420 (9th Cir. May 22, 2019).

[5] [MPP Guiding Principles], CBP Enforcement Programs Division, https://www.cbp.gov/sites/default/files/assets/documents/2019-Jan/MPP%20Guiding%20Principles%201-28-19.pdf (stating that the MPP should not be applied to people with known physical or mental health issues); Executive Director Todd A. Hoffman, Office of Field Operations, Guidance on Migrant Protection Protocols, CBP (Jan. 28, 2019) https://www.cbp.gov/sites/default/files/assets/documents/2019-Jan/MPP%20OFO%20Memo%201-28-19.pdf (stating that "[t]he Guiding Principles outline which aliens may be amenable to MPP" and instructs recipients to "ensure that this memorandum is disseminated to all ports of entry.").

CLASS ACTION COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

60.     Defendants similarly refuse to allow Plaintiffs' family members to accompany them into the United States or to assist Plaintiffs in preparing for and participating in their 240 Proceedings. Defendants have a policy of maintaining family unity "to the greatest extent operationally feasible, absent a legal requirement or an articulable safety or security concern that require separation" (the "Family Unit Policy").[6] Defendants have been enjoined from separating parents from their minor children when in detention or upon release from detention, for example, through continuing to detain the minor children while releasing the parents, or vice versa. *Ms. L. v. U.S. Immigr. & Customs Enf't,* No. 18-CV-0428-DMS-MDD (S.D. Cal. June 26, 2018), Docket Nos. 82-83.[7]

## IV.    FACTUAL ALLEGATIONS

**A.    Conditions that People with Disabilities Face When Placed in the MPP and Returned to Mexico**

*Defendants place persons with known physical or mental health issues and/or disabilities in the MPP*

61.     Defendants routinely place persons with known physical or mental health issues, including qualified individuals with disabilities, in the MPP.  Yet, Defendants have no mechanism to properly screen individuals with disabilities and exempt them from the program.

62.     Defendants' practice has been widely reported.[8] For example, six people with physical and/or mental health disabilities, including four children, were placed in the MPP and sent to Ciudad Juárez. One of those persons, a fourteen-year-old child

---

[6] National Standards on Transport, Escort, Detention, and Search, CBP, https://www.cbp.gov/sites/default/files/assets/documents/2020-Feb/cbp-teds-policy-october2015.pdf (last updated February 28, 2020)

[7] Compare class certification order, Docket No.82, to preliminary injunction, docket no. 83, both issued on the same day.

[8] *See, e.g., US Move Puts More Asylum Seekers at Risk,* Hum. Rts. Watch (Sept. 25, 2019), https://www.hrw.org/news/2019/09/25/us-move-puts-more-asylum-seekers-risk; Jessica Eller et al., *Migrant Protection Protocols: Implementation and Consequences for Asylum Seekers in Mexico,* 218 U. Tex. Austin Strauss Ctr. Int'l Sec. & L. 26 (May 2020), https://repositories.lib.utexas.edu/handle/2152/81991.

CLASS ACTION COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

with intellectual disabilities, appeared to be confused and distraught by his situation.[9]

63.    In Matamoros, Mexico, across the border from Brownsville, Texas, attorneys with the organization Lawyers for Good Government have confirmed that children with disabilities were being placed in the MPP, which included at least two children with Down Syndrome.[10]

64.    A 2019 article by *The Guardian* details the story of José, an asylum seeker with a severe cognitive disability who sought asylum. When José and his family arrived at the U.S. border, they provided officials with a written statement from his doctor affirming that he had the cognitive age of a four-year-old child. Nevertheless, Defendants separated him from his caretaker, detained him in an El Paso detention facility for two weeks, and then bused him to Ciudad Juárez, Chihuahua, Mexico, and placed him in the MPP.[11]

65.    José was unable to provide basic information such as his date of birth or age, and immigration advocates informed government officials of his condition. Nevertheless, he was sent back to Ciudad Juárez, where he stayed without any support for nearly three months.[12]

66.    Immigration advocates arranged for José to undergo another cognitive assessment, which confirmed the earlier diagnosis, including the fact that Jose had no concept of time or space, and no real idea of where he was. Despite this evidence, CBP insisted on retesting him and held him in a detention center for three days. CBP then inexplicably sent Jose back to Mexico, where he remained at the time of the article.[13]

67.    Other outlets have confirmed that individuals with disabilities who

---

[9] *Id.*

[10] *Id.*

[11] Adam Gabbatt, *'Like a Child': The Disabled Migrant Stranded and Alone in Mexico*, GUARDIAN (July 18, 2019), https://www.theguardian.com/us-news/2019/jul/27/mexico-disabled-migrant-stranded-trump.

[12] *Id.*

[13] *Id.*

CLASS ACTION COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

should be exempt from the MPP continue to be held in the program, despite their inability to access their immigration proceedings or the necessary medical treatments in Mexico.[14]

*Living conditions in Mexico for people with disabilities housed in shelters and migrant "camps"*

68.    The living environment for those returned to Mexico, including in overcrowded shelters or makeshift tent encampments, exacerbates any existing health conditions and puts these individuals at risk for developing infectious diseases.[15] There is heightened inaccessibility to health care due to the violence in northern Mexico border cities and a lack of basic services, including medical supplies. Basic care is in general provided by over-burdened and under-funded non-governmental organizations.[16]

69.    Most of the shelters and facilities available to those returned to Mexico are inaccessible to persons with disabilities and lack the necessary resources for persons with physical and mental disabilities. Many individuals are fearful of leaving to seek care.[17]

70.    Apart from these shelters and facilities, those who must live in tent encampments face even more inaccessibility issues. For example, at the tent encampment in Matamoros, Tamaulipas, Mexico, which at its height held 2,500 people, there are only a handful of outdoor showers. There is also a limited number of portable toilets, which at times have overflowed with human waste. Insufficient

---

[14] Reynaldo Leaños Jr., *Border Officials Keep Sending Asylum Seekers With Disabilities, Illnesses Back To Mexico*, TEX. PUB. RADIO (Feb. 21, 2020), https://www.tpr.org/border-immigration/2020-02-21/border-officials-keep-sending-asylum-seekers-with-disabilities-illnesses-back-to-mexico.

[15] Megan Diamond, et al., *A Population in Peril: A Health Crisis Among Asylum Seekers on the Northern Border of Mexico*, HARV. GLOB. HEALTH INST. & B.C. SCH. SOC. WORK 1 (2020), https://globalhealth.harvard.edu/wp-content/uploads/2020/07/A_Population_in_Peril.pdf.

[16] *Id*. at 4.

[17] *Id*. at 5.

CLASS ACTION COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

access to potable water frequently leads to chronic dehydration and heat stroke.[18]

71.    Existing disabilities and chronic health conditions are exacerbated by the routine confiscation of medications by CBP agents.[19] It can take weeks to secure new prescriptions in Mexico. Those held in CBP custody also commonly report chronic conditions being undiagnosed and left untreated, as well as inconsistent initial medical screening protocols performed by the Mexican government. In particular, the Mexican government has provided insufficient information to people with disabilities and chronic health conditions regarding how they could access healthcare.[20]

72.    Being returned to Mexico can be a "catastrophic stressor on health" for these individuals due to the stress from waiting in a dangerous living environment and trauma from their experiences in migration.[21]

73.    Minors are especially vulnerable to exacerbated mental health issues. Due to the high need for mental health and psychosocial services for those placed in the MPP, those with psychiatric disabilities face a lack of care.[22]

74.    Generally, Mexico does not have enough health care resources, particularly in the border cities where Defendants have forcibly sent Plaintiffs. In three Mexican border states, the physician to population ratio is approximately 0.6 to 1,000, and compared to other nations, Mexico exhibits poor performance on quality of care indicators, including amputations on diabetic patients and avoidable hospital admission. As a result, under-funded and over-burdened faith-based and nonprofit organizations attempt to fill the gaps in health care services and supplies for those

---

[18] *Id*.

[19] *Id*. at 6.

[20] *Id; see also*, Human Rights Watch, *Mexico: Risks at Border for Those with Disabilities*, HUM. RTS. WATCH (Oct. 29, 2019), https://www.hrw.org/news/2019/10/29/mexico-risks-border-those-disabilities.

[21] Diamond, et al., *supra* note 15, at 7.

[22] *Id*.

CLASS ACTION COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

sent to Mexico whose disabilities Defendants refuse to accommodate.[23]

75.    Researchers in December 2018 in Tijuana identified many barriers that those migrating through Mexico face—and since the MPP began to be administered in January 2019, conditions have not improved. Due to the number of migrants arriving in Tijuana in 2018, Mexican officials used a sports stadium as a shelter. After the stadium flooded during a storm, many migrants were forced to move into the streets.[24]

76.    The sports stadium used as a shelter does not have any bathrooms, forcing migrants to walk outside and pay for the use of a public restroom. Moreover, those with disabilities are unable to access the available restrooms outside of the stadium and, for example, some have required someone to push their wheelchair in order to access the restroom.[25]

77.    While other shelters do have bathrooms on site, these facilities are filthy and have puddles of water on the floor. For instance, at the "El Barretal" shelter, beyond basic hygiene concerns, the slippery floor makes it impossible for wheelchair users to even enter and dangerous for people with physical disabilities to use, as was the case for a migrant named Rafael who uses crutches. To avoid the inaccessible El Barretal bathrooms, Rafael relieves himself in a plastic can and sometimes goes five days without bathing. When he does finally bathe, he pays to use a private bathroom outside of El Barretal.[26]

78.    Migrants have reported being turned away from local clinics and hospitals, which can be deadly for those with serious chronic health conditions.[27]

79.    In Ciudad Juárez, Chihuahua, Mexico, migrants with disabilities and

---

[23] *Id*. at 7-8.

[24] Carlos Ríos Espinosa, *Life with a Disability in the Migrant Caravan*, HUM. RTS. WATCH (Dec. 20, 2018), https://www.hrw.org/news/2018/12/20/life-disability-migrant-caravan.

[25] *Id*.

[26] *Id*.

[27] Eller et al., *supra* note 8, at 29.

CLASS ACTION COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

chronic health conditions face obstacles in obtaining basic services and health care. The Mexican government fails in supporting migrants with disabilities and chronic health conditions returned from the United States by Defendants in a variety of ways. For example, the Mexican government has an inadequate system for identifying people with disabilities and health conditions nor and for providing information about and access to health care.[28]

80.     None of the four shelters in Ciudad Juárez, even the newly built ones, are fully accessible to persons with disabilities returned to Mexico by Defendants. The government-run Leona Vicario National Integration Center, which has a capacity for 3,000 people, originally had no beds, leaving people to sleep on the floor, including persons with disabilities. The shelter also has no accessible bathrooms for persons with physical disabilities and no accessible transportation nearby.[29]

81.     Some individuals with disabilities reported that neither American nor Mexican government officials provide them sufficient information or otherwise facilitate access to health care. Although a state health insurance program exists for low-income migrants, many were not told of its existence. For example, a woman with high blood pressure and a man with a prosthetic eye were deprived of critical health care because they were not informed of the state health insurance.[30]

82.     Limited food options at many shelters results in an inability to provide appropriate dietary accommodations for persons with certain disabilities and chronic illnesses, which can lead to a deterioration in their health.[31]

83.     The COVID-19 pandemic has also exacerbated access to shelters for individuals with disabilities returned from the United States. In Matamoros and

---

[28] *Mexico: Risks at Border for Those with Disabilities*, HUM. RTS. WATCH (Oct. 29, 2019), https://www.hrw.org/news/2019/10/29/mexico-risks-border-those-disabilities.

[29] *Id.*

[30] *Id.*

[31] *Id.*

CLASS ACTION COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

Tijuana, migrant shelters have announced that they will be closing or no longer accepting new residents.[32]

*Deafness*

84.    Numerous sources point to Mexico as being unsafe and unsupportive to deaf or hard-of-hearing persons.

85.    There is a lack of sign language interpreters for the most basic services, especially in health care. In a survey regarding accessibility, a mother in the MPP with a deaf child stated that there are no sign interpreters in Mexican hospitals and that sometimes hospitals would not allow her to accompany her deaf child to appointments.[33]

86.    Advocates for individuals who are deaf or hard-of-hearing in Mexico often speak to the constant discrimination and societal and institutional barriers that deaf persons face in Mexico.[34]

*Blindness*

87.    People who are visually impaired face architectural barriers as a major obstacle to accessing rehabilitation services in Mexico.[35]

88.    Blind people also face discrimination and accessibility challenges in Mexico. For example, many blind people are prevented from entering public places and using public transportation with their guide dogs. Once inside, navigating public places can be particularly difficult, for barriers such as many elevators do not have

---

[32] *Id*. at 30.

[33] Amanda Admire & Blanca Ramirez, *Violence and Disability: Experiences and Perceptions of Victimization Among Deaf People*, JOURNAL OF INTERPERSONAL VIOLENCE 13-14 (Sept. 14, 2017), https://journals.sagepub.com/doi/10.1177/0886260517730564.

[34] Paola Cortés Pérez, *Sordos Enfrentan Discriminación Social e Institucional: DIES*, UNIVERSO (Nov. 3, 2018), https://www.uv.mx/prensa/general/sordos-enfrentan-discriminacion-social-e-institucional-dies/.

[35] Guillermo Rivera, *Como es Ser Invidente en México*, VICE (en español) (July 7, 2016), https://www.vice.com/es/article/pp5qvm/los-ciegos-la-tenemos-complicada-como-es-ser-invidente-en-mexico.

CLASS ACTION COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

braille signage.[36]

89.    In its 2019 Country Reports on Human Rights Practices, the State Department stated that public buildings and facilities were often not accessible to those with disabilities. Furthermore, the State Department documented systemic problems of abuse and unhygienic conditions within mental health institutions and care facilities meant for people with disabilities in Mexico.[37] The report found that "[p]ublic buildings and facilities often did not comply with the law requiring access for persons with disabilities."[38]

## B.    Heightened Risks to People with Disabilities of Kidnapping, Abuse, and Hospitalization in the Informal Refugee Camps

90.    By placing individuals with disabilities and medical conditions and their families in the MPP, Defendants force them to live in Mexico where they are particularly vulnerable to criminal activity. Plaintiffs and putative class members stand out within their Mexican surroundings because they live in the camps, speak with non-Mexican accents (or do not speak Spanish at all), or because of their disability. Criminals often assume people in the MPP have U.S. relatives who can be extorted for large sums of money.

91.    From November 2019 to January 2020, criminal organizations in the Mexican state of Tamaulipas kidnapped at least 80 migrants and attempted to kidnap an additional 19 people who were in the MPP.[39] The organization Doctors Without Borders reported that between June 2018 and July 2019, 45% of the 2,315 people (migrant, asylum seekers, refugees, or returnees) treated by their mental health teams

---

[36] Mario Mora Legaspi, *Lamentan que Haya Discriminación Hacia Personas Invidentes*, FUNDACIÓN ONCE AMÉRICA LATINA (Oct. 7, 2014), https://www.foal.es/es/noticias/lamentan-que-haya-discriminaci%C3%B3n-hacia-personas-invidentes.

[37] U.S. DEP'T OF STATE, COUNTRY REPORTS ON HUMAN RIGHTS PRACTICES FOR 2019: MEXICO 25 (2019), https://www.state.gov/reports/2019-country-reports-on-human-rights-practices/mexico/.

[38] *Id.*

[39] *US: Investigate 'Remain in Mexico' Program*, HUM. RTS. WATCH (June 2, 2020), https://www.hrw.org/news/2020/06/02/us-investigate-remain-in-mexico-program.

CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

in the Tamaulipas cities of Reynosa and Matamoros reported being victims of violence while in Mexico.[40]

92.    In line with these larger trends, Plaintiffs have suffered under the poor health conditions, disability discrimination, and crime they experience in Mexico. Many have ended up being hospitalized in Mexico or have had their conditions deteriorate, resulting from lack of access to the medical care that would have kept Plaintiffs healthy. For example, in January 2020, while Plaintiff D.Y.S. and his mother were staying in a shelter in Matamoros as a result of Defendants actions, he was sexually assaulted. D.Y.S.'s health deteriorated in the weeks following the sexual assault: He began having seizures and was eventually hospitalized. Similarly, Plaintiff S.M.A. and her mother ran out of medicine for S.M.A.'s brain disorder, lissencephaly, after being sent to a makeshift migrant camp in Matamoros, Mexico. Her mother had no way of replacing the medicine, resulting in S.M.A's hospitalization.

93.    Apart from issues of crime and health, conditions in the camp lack the basic safeguards to make life stable and secure for Plaintiffs and class members.

94.    In addition to the above-mentioned risks, the COVID-19 pandemic has made the situation for individuals with disabilities and medical conditions in the MPP more dire. On July 17, 2020, DHS and DOJ postponed Section 240 proceedings for people in the MPP until the completion of certain public health criteria, which caused additional backlog in court proceedings.

95.    Nonetheless, Defendants are still issuing new hearing dates for people in the MPP. Plaintiffs who have been given updated court hearing dates have attempted to prepare for their claims despite the limitations and lack of access noted above, only to have the court dates postponed yet again each time.  Each successive

---

[40] *US 'Remain in Mexico' Policy Endangers Lives of Asylum Seekers in Tamaulipas State*, DOCTORS WITHOUT BORDERS (Sept. 5, 2019), https://www.doctorswithoutborders.org/what-we-do/news-stories/news/us-remain-mexico-policy-endangers-lives-asylum-seekers-tamaulipas.

CLASS ACTION COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

postponement of Plaintiffs' hearings does nothing to provide them with appropriate accommodations to pursue their claim: Plaintiffs are forced to remain in the abysmal conditions described in detail above in order to access even basic medical care and humanitarian aid. If they leave and are forced to give up their space in a shelter or a refugee camp, where access is restricted, some people risk losing access to even these minimal protections of the tent camp or shelter.

96.    In addition to the crime and poor health conditions that Plaintiffs have experienced in Mexico, they now face another layer of threat due to COVID-19 exposure. The informal refugee camps force people to live within arm's reach of other tents. These overcrowded conditions are ripe for the spread of COVID-19.[41] Named Plaintiffs and other similarly situated individuals have medical conditions and/or disabilities that put them at high risk of serious, potentially life-threatening outcomes from COVID-19.

## C.    The Named Plaintiffs' Experiences

## 1., 2., & 3.  E.A.R.R., G.S.E.R., and B.A.E.R.

97.    Defendants forcibly sent E.A.R.R. and her two sons, G.S.E.R. and B.A.E.R., to Mexicali, Mexico pursuant to the MPP.

98.    E.A.R.R. is a person with disabilities: She has a pituitary tumor that presses against her brain and causes severe headaches, dizziness, and fainting spells. Doctors diagnosed the tumor about three years ago, but E.A.R.R. was unable to undergo the necessary procedures to manage her condition. Her condition substantially limits her ability to care for herself, think, concentrate, and work, and impairs her neurological and brain functions.

99.    E.A.R.R.'s son, G.S.E.R., is also a person with a disability: he has only one functioning lung. This substantially impairs his respiratory and immune functions. For example, when exposed to cold temperatures, he suffers from a severe

---

[41] Ashoka Mukpo, *Asylum Seekers Stranded in Mexico Face a New Danger: COVID-19*, ACLU (Mar. 26, 2020), https://www.aclu.org/news/immigrants-rights/asylum-seekers-stranded-in-mexico-face-a-new-danger-covid-19/.

CLASS ACTION COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

cough.

100.    On or around May 17, 2019, Defendants apprehended E.A.R.R. and her children and took them into custody. Defendants detained E.A.R.R. and her sons for five days, including time in a *hielera* (a Spanish-language term immigrants use to refer to certain border detention facilities).

101.    Defendants knew about E.A.R.R.'s and G.S.E.R.'s physical health conditions because these conditions worsened in the *hielera*. At the *hielera,* G.S.E.R. developed a severe cough due to the cold temperature's impact on his lung condition. E.A.R.R. battled an incapacitating headache caused by her tumor. After making her wait for several hours, Defendants' guards gave her medication that alleviated some of the pain.

102.    On information and belief, sometime during the family's detention, Defendants placed E.A.R.R., G.S.E.R., and B.A.E.R. in the MPP. They did not receive interviews or an opportunity to discuss their medical concerns about being returned to Mexico. The family was never given a chance to understand the determination, appeal the decision, or contact a lawyer. Instead, Defendants forcibly sent them to Mexico.

103.    Since being sent to Mexicali, E.A.R.R. and her sons have struggled. E.A.R.R. is very worried about not being able to afford treatment if she or her sons get ill. She has been unable to work as she has no-one to care for her sons and is afraid for her and her sons' safety.

104.    Because of this stress and instability, E.A.R.R.'s headaches have worsened: The pain now spreads down her arms and hands and she is barely able to sleep due to the pain. She has dizzy spells that impair her ability to function.

105.    Within the past couple of months, E.A.R.R. went to get medicine for her headaches at a pharmacy. The medical personnel referred her to a specialist for several tests. Based on her blood test, the specialist told her that, due to her pituitary tumor, she had extremely high levels of the hormone prolactin in her blood—the

CLASS ACTION COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

healthy level being around 20 nanograms per milliliter (ng/mL) and hers being around 150 ng/mL. She had a follow-up appointment, but despite receiving medicine, E.A.R.R.'s condition has not improved and suffers from severe headaches, pain in both arms, and dizziness. She was told that she now needs surgery.

106.   E.A.R.R. struggles to perform everyday tasks because of her severe headaches and she is worried her family is even more vulnerable in Mexico because of her medical condition. As she struggles due to her medical condition, she will be unable to meaningfully participate in her and her sons' removal proceedings. Her severe headaches and difficulty sleeping impact her ability, on behalf of herself and her children, to (i) focus on and understand what is asked of her to participate in immigration proceedings on behalf of herself and her children; (ii) provide accurate, relevant, helpful responses to questions in court or on necessary forms; and (iii) collect and provide required information and documents.

107.   E.A.R.R. is very worried that her son, G.S.E.R., will contract COVID-19. She knows that he is more vulnerable due to his lung disorder.

108.   As G.S.E.R. is thirteen years old and B.A.E.R. is twelve years old, E.A.R.R. prepares their cases and presents their claims in conjunction with her own. Because of this, E.A.R.R.'s disability significantly impedes her participation in her immigration court proceedings, and E.A.R.R. must spend significant resources in caring for G.S.E.R. due to his medical condition. As a result, although he does not have a disability or medical condition, B.A.E.R. cannot receive proper assistance from his mother in the preparation of his case.

109.   When she appeared for a hearing, E.A.R.R. tried to tell the judge that she and her son experience severe health issues and that they felt unsafe returning to Mexico. The judge suggested E.A.R.R. talk with immigration officers about this, but Defendants' employees never gave her the chance to do so before forcibly sending her back to Mexico.

110.   E.A.R.R. and her children were denied relief in immigration court

CLASS ACTION COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

proceedings and her case is now on petition for review before the Ninth Circuit Court of Appeals. She and her children face obstacles along the appeal process as well.

**4.    L.Y.G.**

111.    Defendants forcibly sent L.Y.G. and her two children to Tijuana, Mexico pursuant to the MPP.

112.    L.Y.G. has multiple physical and mental disabilities and disorders: She has hypertension (high blood pressure), hyperglycemia (high glucose levels), scoliosis, kidney stones so severe that she needs surgery, Post-Traumatic Stress Disorder (PTSD), and panic attacks. Four years ago, doctors diagnosed her with scoliosis. On a daily basis, L.Y.G.'s scoliosis substantially impairs her ability to walk, stand, lift, bend, and care for herself. Additionally, her chronic conditions—hyperglycemia and hypertension—impairs her immune and circulatory function. Her PTSD and panic attacks impair her ability to think, concentrate, and communicate.

113.    Defendants detained L.Y.G. and her children in the in the *hielera* for four days. Defendants were aware of L.Y.G.'s physical disabilities because they performed a medical examination on her. In addition to her disabilities, Defendants' medical staff diagnosed L.Y.G. with an additional physical health condition: influenza. Every day, the officers brought L.Y.G. medicine, but she did not know what type of medicine they were bringing her. L.Y.G. remembers having a fever and her daughter telling her that her skin was hot to the touch.

114.    Upon information and belief, Defendants decided to place L.Y.G. and her family into the MPP. They did not receive interviews or an opportunity to discuss their medical concerns about being returned to Mexico. The family was never given a chance to understand the determination, appeal the decision, or contact a lawyer. Instead, Defendants' employees forcibly sent them to Mexico. Indeed, Defendants sent L.Y.G. to Mexico even when she had not recovered fully from the flu. L.Y.G. was not able to explain why she could not return to Mexico.

115.    L.Y.G. has experienced numerous barriers to medical treatment. Since

CLASS ACTION COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

March 2020, L.Y.G. has not been able to get free medications for her panic attacks; therefore, she cannot manage her conditions. L.Y.G. is afraid to have surgery because she has heard that her operation is serious and she is concerned about what will happen to her children if she were to die.

116.   Given L.Y.G.'s ongoing weakness and her mental health deterioration, L.Y.G. struggles to participate fully in the family's removal proceedings. Due to her physical and mental health limitations, L.Y.G. is struggling for the survival of herself and her children. She does not have the mental or physical ability to complete all tasks necessary in between court hearings: preparing documents, compiling evidence, and communicating with attorneys. Furthermore, the limitations posed by her disabilities will prevent L.Y.G. from fully understanding and communicating at long and exhausting removal proceedings.

**5.    H.A.H.G.**

117.   Defendants forcibly sent H.A.H.G. and his family to Tijuana, Mexico pursuant to the MPP.

118.    Due to a brutal physical attack, H.A.H.G. has permanent hearing loss, an inguinal hernia, kidney cyst, and physical impairments. H.A.H.G. has severe, chronic pain in his back, neck, head, and left eye. As a result, this pain causes headaches, burning sensations around his eye, and inability to breathe well through his nose, substantially impairing his respiratory functions and limiting his ability to think, concentrate, and care for himself. H.A.H.G. has a dislocated disc in his spine and struggles to move his left arm and leg, which impairs his ability to walk, lift, bend, stand, and perform manual tasks. His disabilities are easily observable.

119.   On or about on June 18, 2019, H.A.H.G. and his two sons were apprehended. His wife entered the day before them on June 17, 2019, with their other children. His wife and three of their children are currently in the United States, while he and their two sons remain in Mexico.

120.   Defendants detained H.A.H.G. and his sons in a *hielera* for four days.

Defendants were aware of H.A.H.G.'s disabilities. Upon arrival at the *hielera*, H.A.H.G. asked to speak with a doctor and for medicine because he was experiencing severe pain. H.A.H.G. repeatedly requested medical attention for his pain, but Defendants repeatedly denied or ignored his requests. At one point, Defendants told H.A.H.G. that only children were entitled to medical attention. H.A.H.G. struggled to sleep because of the pain.

121.   During his detention, H.A.H.G. was interviewed by Defendants' employees. H.A.H.G. explained the attack and his resulting limitations, pointing to places on his body where he had been injured.

122.   Upon information and belief, Defendants decided to place H.A.H.G. into the MPP. He was never given a chance to understand the determination, appeal the decision, or contact a lawyer. Instead, Defendants forcibly sent him and his sons to Mexico.

123.   H.A.H.G. continues to endure severe pain from his disabilities. In Mexico, there are many days where H.A.H.G. is unable to walk or do anything because of the pain he is experiencing. Sometimes, he is unable to even put his foot on the floor to get out of bed because he is in so much pain. H.A.H.G. has been taking over-the-counter painkillers like ibuprofen for over two years, but the medication is insufficient to address the resulting limitations. Doctors have told H.A.H.G. that he needs a neurologist, a pain management specialist, a kidney specialist, and a spinal column specialist to address his physical limitations—medical treatment unavailable in Mexico.

124.   Because H.A.H.G. is not a Mexican citizen, he faces barriers to access health care in Mexico that prevent him from receiving such specialized medical treatment. This makes it very hard for him to take care of his children and himself, let alone work on their asylum case. He and his sons therefore face obstacles preparing for and participating in their immigration proceedings because of H.A.H.G.'s disability. His sons help him as much as they can, but they are too young

CLASS ACTION COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

to prepare court filings, compile evidence, consult with attorneys, and represent the family in removal proceedings.

125.    H.A.H.G. struggles to complete ordinary, day-to-day tasks. Due to the physical limitations, his lack of hearing aid, his headaches, and his chronic pain, he believes his conditions will interfere with his ability to travel to court, sit through hours of proceedings, understand the judge, and adequately present his family's asylum case. Furthermore, he finds it challenging to go to court, especially due to the long wait involved in waiting for transportation to court hearings in MPP.

**6. & 7. Y.J.C.E. and J.A.E.M.**

126.    Defendants forcibly sent a child with disabilities, Y.J.C.E., his mother J.A.E.M., and the rest of his family to Mexicali, Mexico pursuant to the MPP.

127.    Y.J.C.E. has a physical health condition: a heart murmur that causes chest pain. This congenital heart defect substantially limits his respiratory function, causing him to struggle to breathe at times. Y.J.C.E.'s heart veins are smaller than normal, so doctors recommend that he needs to be under medical surveillance at all times and cannot do any strenuous activities. Additionally, Y.J.C.E.'s immune system is substantially impaired, meaning that he may not survive medical events such as a fever, a cold, or COVID-19.

128.    On or around October 26, 2019, Defendants took Y.J.C.E. and his family into custody. The agents separated Y.J.C.E. and his father from J.A.E.M. and sister.

129.    Defendants detained Y.J.C.E. and his family for three days. Defendants were aware of Y.J.C.E.'s medical condition. While detained, Y.J.C.E. was examined by a doctor who told his mother, J.A.E.M., that her son had a heart murmur and that his condition could worsen in the future. J.A.E.M. immediately grew concerned that the *hielera*'s cold temperatures would worsen her son's condition.

130.    Defendants placed Y.J.C.E. into the MPP with his mother J.A.E.M, his sister and his father. His parents were never given a chance to understand the

determination, appeal the decision, or contact a lawyer. Instead, Defendants' employees forcibly sent them to Mexicali, Mexico in a small bus. Given the doctor's recent prognosis, his mother, J.A.E.M., was terrified for her son's health.

131.   J.A.E.M. and her husband struggle to care for him in Mexico. Their housing will soon end, placing them at risk of becoming homeless. Y.J.C.E.'s medical insurance has ended, so his mother worries that he will not be able to receive adequate medical care for his condition. In particular, J.A.E.M. is worried that Y.J.C.E. will be exposed to COVID-19 and she will not be able to afford a doctor visit or the necessary medicine.

132.   Y.J.C.E. and his family have had three immigration court hearings. Their individual court proceeding was set for April 2020, but because of COVID-19, it has been delayed and they have stayed much longer in Mexico.

133.   Given their circumstances in Mexico and Y.J.C.E.'s need for constant supervision, J.A.E.M. uses a substantial amount of time, energy, and focus to concentrate on overcoming daily obstacles, such as ensuring Y.J.C.E. remains healthy. Thus, it is difficult for J.A.E.M. to concentrate on preparing for their asylum claim. This affects Y.J.C.E. who is a minor and relies on his parents to represent his interests in court.

**8. & 9. S.F.L. and C.J.M.L.**

134.   Defendants forcibly sent S.F.L. and her eight-year old son, C.J.M.L., to Tijuana, Mexico pursuant to the MPP.

135.   S.F.L. has multiple medical conditions: diabetes, cataracts, and severe depression. Doctors diagnosed her diabetes fourteen years ago. This condition substantially limits her ability to care for herself and sleep. For example, she wakes up regularly at night when her blood sugar level drops dangerously low. When this happens, S.F.L. is unable to help herself; instead, she relies on C.J.M.L. to bring her food or something to drink to increase her blood sugar levels. S.F.L.'s cataracts are a result of her diabetes. The cataracts impair her ability to see and cause pain in her

head, which limits her ability to read and think. She has had surgery but still has vision problems. Lastly, her depression interferes with her ability to focus and care for herself, causing her to have suicidal thoughts.

136.   S.F.L.'s eight-year-old son, C.J.M.L., was born with a closed urethra, which required surgery when he was just three months old. Although he needs another surgery, he must first see an endocrinologist because he is also prone to low blood sugar. S.F.L. already struggles due to her own health, and at times must rely on her son. As a result, having to care for C.J.M.L.  further aggravates S.F.L.'s circumstances.

137.   Defendants detained S.F.L. and her son. Defendants were aware of S.F.L.'s disabilities because, on the third day in the *hielera*, S.F.L. told Defendants' agents that she and her son were ill and informed the agents that she was diabetic and that her son's symptoms are likely indicative of low blood sugar. S.F.L. also informed the agents that she had been told that C.J.M.L. needs to see a specialist related to his blood sugar issues.

138.   The agents took S.F.L. and her son to the hospital for a check-up. During the check-up, S.F.L. told the doctor about her cataracts. The doctor then gave S.F.L. diabetes medicine and sent her and C.J.M.L. back to the *hielera*.

139.   On information and belief, around that time, Defendants placed S.F.L and C.J.M.L. into the MPP. She was never given a chance to understand the determination, appeal the decision, or contact a lawyer. Instead, Defendants forcibly sent them to Mexico.

140.   In Mexico, S.F.L. cannot access the food and medical care necessary to manage her disabilities. S.F.L. is unable to afford to see the specialists she and C.J.M.L. so desperately need in order to improve their health. The conditions have worsened her depression. S.F.L. often struggles to find enough food to sustain them, further exacerbating their low blood sugar issues.

141.   At S.F.L.'s first court hearing in the United States, she informed the

CLASS ACTION COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

judge that she needed emergency surgery for her eyes because her cataracts made it increasingly difficult to see. The judge told S.F.L. that she needed to find an attorney and to inform immigration officers. S.F.L. informed the officers but was still sent back to Mexico.

142.   S.F.L.'s limitations have already almost forced her and C.J.M.L. to lose their immigration proceedings. In Mexico, S.F.L.'s eyesight rapidly degraded. After she was nearly run over by a car, she became fearful for her life and for what would happen to C.J.M.L. if she died. S.F.L. underwent emergency surgery. Because of complications from this surgery, S.F.L. was forced to miss her last court date. She was informed that the court terminated their case due to her absence. Their case was appealed and remanded to the immigration court. However, due to her limitations, S.F.L. still faces challenges to prepare for and attend her hearings with C.J.M.L. Her cataracts, for example, may severely impede her ability to read, review, and present documents in hearings that rely on written documents. Her depression can affect her motivation and focus on preparation and participation.

**10. & 11. Y.M.M. and J.C.M.M.**

143.   On or around March 27, 2020, Defendants forcibly sent Y.M.M. and her daughter J.C.M.M. to Matamoros, Mexico under the MPP. They were then taken to Tijuana, Baja California by the Mexican government.

144.   Y.M.M. suffers from a trauma-related disorder consistent with PTSD. Her condition substantially interferes with her ability to think, communicate, and care for herself and for J.C.M.M. While trauma-related disorders are not visible to the eye, Y.M.M. had an interview with an official, and her cognitive issues would become apparent upon an interview with her. At the time of her detention in CBP custody, Y.M.M. also had a severely infected foot that limited her ability to walk, of which Defendants were also aware.

145.   J.C.M.M. has epilepsy, a mild intellectual disability, severe asthma, frequent urinary tract infections, and a bleeding condition for which she has

CLASS ACTION COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

undergone testing due to the possibility that it is tumor-related. J.C.M.M.'s medical conditions substantially interfere with her cognitive abilities and her awareness and physical safety, as well as her bladder and immune functions. As she suffered a seizure in detention, her epilepsy was or should have been open and obvious to Defendants. J.C.M.M.'s uncontrolled asthma was or should have been also open and obvious to Defendants, as the asthma attack she suffered in their custody caused her to appear purple all over at times when she was in detention.

146. Defendants detained Y.M.M. and J.C.M.M. Defendants knew about their medical conditions. While detained, Y.M.M. asked Defendants' for medical help for J.C.M.M.

147. Defendants decided to place Y.M.M. and J.C.M.M. into the MPP. They were never given a chance to understand the determination, appeal the decision, or contact a lawyer. Instead, Defendants' employees forcibly sent them to Mexico.

148. The conditions in Mexico have exacerbated the limitations arising from both Y.M.M.'s and J.C.M.M.'s medical conditions. J.C.M.M. requires significant medical care, chiefly for her epilepsy and intellectual impairment, as well as for her urinary condition. Due to the strain of trying to find the medical care that J.C.M.M. needs and the stress of the conditions in which they are living, Y.M.M.'s mental health condition has deteriorated, affecting her ability to think, concentrate, focus, and communicate. Y.M.M. has a traumatic disorder that is being diagnosed, which causes her to experience scattered thinking. These limitations mean that Y.M.M. is struggling to understand and prepare for her immigration case.

149. Furthermore, as Defendants placed them into separate removal proceedings, J.C.M.M., as a six-year old with uncontrolled epilepsy and asthma, will likely be forced to attend any hearing alone, without the support of Y.M.M. J.C.M.M.'s seizure condition is currently poorly controlled, creating a risk that she will have a seizure while waiting for a hearing, on the way to a hearing, or during a hearing. This would preclude meaningful participation in their case and puts

CLASS ACTION COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

1    J.C.M.M.'s health in grave danger.

2    **12.    G.F.F.**

3    150.    Since around July 2019, Defendants have forcibly kept G.F.F., a thirty-
4    eight-year-old man, in Tijuana, Mexico under the MPP.

5    151.    G.F.F. is a victim of torture, which occurred while in his home country.
6    He has been diagnosed with depression and suffers from insomnia and traumatic
7    nightmares. These conditions significantly impair his ability to think, concentrate,
8    and sleep.

9    152.    In or around July 2019, Defendants detained G.F.F. His initial detention
10    by Defendants resurfaced the trauma of his past torture.

11    153.    Defendants placed G.F.F. into the MPP. He was never given a chance
12    to understand the determination, appeal the decision, or contact a lawyer.

13    154.    G.F.F. attended one court hearing for his immigration case.  For his
14    following hearing, he was not given special transport instructions needed to be
15    transported to his hearing, so he was not allowed to enter the United States to attend
16    court. In his absence, he was ordered removed. This led to his detention by Mexican
17    authorities.

18    155.    On or around February 25, 2020, G.F.F. was re-detained by Mexican
19    officials and held for about twenty-five days.  Because he had been tortured in
20    detention by his home country's government, this experience again traumatized him.
21    He asked to see a physician and tried to show his documentation for his prescriptions
22    and diagnoses unsuccessfully. G.F.F. was seen by a physician only towards the end
23    of his detention, around the twenty-third or twenty-fourth day of detention. The
24    physician referred him to a psychiatrist, but G.F.F. was released before he could see
25    a psychiatrist in detention.

26    156.    G.F.F.'s disability, known to the Defendants, prevents him from
27    meaningfully participating in his immigration proceedings because the trauma of his
28    torture in detention by government officials is aggravated by the repeated detention

and interaction with CBP officers that the MPP court involves.

**13.   M.Y.J.L.**

157.   Since on or around March 13, 2020, Defendants have forcibly kept M.Y.J.L., a thirty-four-year-old woman, in Tijuana, Mexico, with her husband under the MPP.

158.   She suffers from fibroids and endometriosis. Her fibroids and endometriosis cause her debilitating pain and protracted menstrual bleeding. Her condition is worsening and, in transit to the border with the United States, Mexican agency workers referred her to specialist care.  However, she has not been able to pursue this or obtain the care that she needs.

159.   On or around March 13, 2020, M.Y.J.L. and her husband were detained by the Defendants.  M.Y.J.L., who is only fluent in Spanish, tried to make Defendants aware of her disability but Defendant did not provide a Spanish-fluent agent nor an interpreter.  Defendants did not otherwise seek to engage meaningfully with M.Y.J.L. in discussing her disability.

160.   Defendants placed M.Y.J.L. into the MPP. She was never given a chance to understand the determination, appeal the decision, or contact a lawyer. Nevertheless, Defendants forcibly returned M.Y.J.L. and her husband to Mexico.

161.   M.Y.J.L. has been unable to obtain the care she needs since she was placed in MPP and her condition is getting worse. The protracted bleeding makes her feel weak and her pain is debilitating and worsening. This pain is such that it would prevent her from being able to prepare for her hearings or participate in them while she is suffering such pain. Her weakness from her bleeding prevents her from being able to take the steps she needs to prepare for her hearings or proceedings or take steps in her case at times that she is not feeling pain.

**14. M.M.G.**

162.   Since on or about September 26, 2019, Defendants have forced M.M.G. and his mother, father, and sister, to remain in Mexico under the MPP.

163.   Plaintiff M.M.G. is a 16-year-old boy, suffering from a brain injury following surgery to reconstruct a brain blood vessel. He experiences painful headaches, impaired memory, and confusion. M.M.G.'s brain injury significantly impairs his ability to think, communicate, and focus as well as his brain functions.

164.   On or around September 19, 2019, Defendants took him and his family, his mother, father, and sister, into detention. While in detention, his mother, V.A.G., notified Defendants of M.M.G.'s brain condition and his need for medical care.

165.   Defendants placed M.M.G. and his family into the MPP. They were never given a chance to understand the determination, appeal the decision, or contact a lawyer. Defendants forcibly returned the family to Mexico.

166.   M.M.G. may be sixteen-years old, but his family has to watch him closely due to his condition: he is easily confused, experiences headaches, and has memory problems. Caring for M.M.G. in MPP takes up much of the family's time and attention, making it difficult to concentrate on his, and their own, claims before the immigration court.

**15.   D.Y.S.**

167.   Since November 2019, Defendants have forcibly kept D.Y.S., a nine-year-old indigenous child, and his mother, M.S.S., in the MPP in Matamoros, Mexico.

168.   D.Y.S. has three long-diagnosed disabilities: epilepsy, autism spectrum disorder, and hyperactivity. D.Y.S.'s disabilities substantially impair his ability to learn, and he depends heavily on his mother even for daily life tasks. D.Y.S. needs M.S.S.'s support to care for himself and eat. These disabilities also severely affect D.Y.S.'s immune system. His disabilities are documented and easily observable.

169.   Defendants took M.S.S. and D.Y.S. into custody sometime in August 2019. Defendants were aware of D.Y.S.'s disability. While in CBP custody, M.S.S. told CBP agents that D.Y.S. had a medical condition and that he needed medicine. She provided medical documentation that explained D.Y.S.'s diagnosed disabilities

CLASS ACTION COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

and resulting medical needs.

170.   Instead of providing medical assistance, CBP agents said that D.Y.S. was "special" and instructed other people not to touch him. While detained in the *hielera* and without adequate care, D.Y.S.'s health rapidly deteriorated so that D.Y.S. had a severe seizure and had to be hospitalized. Nevertheless, agents returned D.Y.S. to the same conditions that caused his hospitalization and failed to provide medication as directed by doctors.

171.   Prior to returning them to Mexico, an officer interviewed M.S.S. over the telephone. She discussed her fear of returning to Mexico and D.Y.S.'s medical conditions. Despite medical documentation, the officer refused to believe that D.Y.S. had medical conditions. On or around the time of this interview, officials decided to place M.S.S. and D.Y.S. in the MPP and return them to Mexico. M.S.S. was never given a chance to understand the determination, appeal the decision, or contact a lawyer.

172.   Upon seeing the bridge, M.S.S. frantically begged the officers not to return her, saying that she was afraid to go to Mexico, especially due to the violence and D.Y.S.'s recent hospitalization and poor health. Despite this, agents forcibly sent M.S.S. and D.Y.S. to Mexico pursuant to the MPP.

173.   On the day after their first immigration court hearing, D.Y.S. was again hospitalized. The doctors gave D.Y.S. some medicine and released him. Soon after his release, M.S.S. approached the international bridge and asked CBP to re-assess their placement in the MPP. D.Y.S. was weak from his hospitalization and needed help walking. Without providing paperwork or a reason for the decision, the agent told M.S.S. that D.Y.S. was fine, implying that the agent was refusing the request for redetermination. The agent never informed M.S.S. or D.Y.S. about any right to appeal the determination.

174.   M.S.S. and D.Y.S., along with an attorney, made two additional attempts to request parole but were denied in the same manner: without a record of

CLASS ACTION COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

the denial or any information about the reason for the denial or appeals process.

175.   D.Y.S.'s limitations affect M.S.S.'s ability to prepare for their immigration hearing. The medical support that D.Y.S. needs for any type of stability is completely out of reach while M.S.S. and D.Y.S. are in the MPP. Without stability, M.S.S. must constantly attend to D.Y.S.'s health and safety; she has no time or resources to work on their asylum case. Despite M.S.S.'s best efforts, every day poses risks to D.Y.S.'s health.

176.   D.Y.S.'s limitations impact M.S.S.'s ability to participate in their immigration hearings. At the tent court, Defendants employees or subcontractors refuse to take care of D.Y.S. due to his disability, telling M.S.S. that she had best keep him. Defendants' employees do not make accommodations for food appropriate for D.Y.S.'s dietary needs, causing D.Y.S. to further struggle. During court hearings, M.S.S. must pay attention to managing D.Y.S. while trying to answer the judge, which can cause her to struggle to speak with the judge and makes her feel flustered.

**16.    S.M.A.**

177.   Defendants forcibly returned a child with disabilities, S.M.A., and her mother to Matamoros, Mexico pursuant to the MPP.

178.   S.M.A. has lissencephaly, a condition caused by the brain's failing to develop normal deep grooves and ridges, which means that she will likely live to be only ten years old. As a result, S.M.A. has seizures and is severely developmentally impaired. This disability substantially impairs major life activities, such as caring for herself, eating, speaking, learning, concentrating, and communicating. Her disability affects major bodily functions such as bowel and bladder functions, as well as neurological, brain, and respiratory functions. S.M.A.'s mother, K.A.M., provides S.M.A. with constant assistance and care.

179.   On or about August 2019, S.M.A. and her mother K.A.M. were apprehended by Defendants, who sent them to a *hielera*.

180.   Defendants are aware of S.M.A.'s disability. Immediately after being

apprehended, K.A.M. told CBP agents about S.M.A.'s disability and need for medication, showing them her medical documentation and medication. At that time, CBP refused to provide S.M.A. with the necessary medical care or treatment.

181.   While at the *hielera*, K.A.M. repeatedly told Defendants about S.M.A.'s condition and need for medication. Although Defendants finally brought medicine, K.A.M. later discovered that agents were providing medication to S.M.A. were not in accordance with the medical documentation and inappropriate for S.M.A.'s condition. In these conditions, S.M.A.'s health deteriorated.

182.   Although aware of S.M.A.'s disability, Defendants placed K.A.M. and her daughter to the MPP. On information and belief, Defendants never asked, or in any way investigated, if K.A.M. or her daughter were afraid to be sent to Mexico.

183.   Defendants provided no notice of decision, opportunity to appeal the decision, or chance to speak with a lawyer. Indeed, K.A.M. did not realize she and her daughter were being sent to Mexico until the bus arrived at the Brownsville-Matamoros bridge. K.A.M. repeatedly explained to CBP officers about S.M.A.'s conditions and the need for proper medication and their fear of Mexico. Instead of providing any process for appeal, or re-determination, the CBP officers answered that they did not care and that K.A.M. and S.M.A. were not welcome in the United States.

184.   While living in Mexico under the MPP, S.M.A.'s health has further deteriorated, causing her be hospitalized. K.A.M. often cannot obtain S.M.A.'s necessary medications on time or, sometimes, at all. Due to S.M.A.'s medical conditions, K.A.M. does not believe her daughter would survive contracting COVID-19.

185.   CBP agents refused to re-evaluate S.M.A.'s placement in the MPP. K.A.M. and S.M.A. have gone twice to the Brownsville-Matamoros Bridge with documentation of S.M.A.'s medical condition. Although they waited hours each time for a decision, Defendants' employees returned them without providing notice or a rationale for the decision or an opportunity to appeal the decision.

186.   Due to S.M.A.'s need for care in the conditions of Matamoros, K.A.M. has struggled to prepare for their immigration proceedings. She cannot leave S.M.A. alone and must continuously worry about S.M.A.'s medication. This interferes with K.A.M.'s time and focus to work on their immigration case, like focusing on tasks such as compiling evidence, completing paperwork, and consulting with her attorney.

187.   S.M.A.'s disability has severely impacted K.A.M.'s ability to participate in their immigration proceedings. As K.A.M. cannot find anyone who can properly care for S.M.A. due to her disabilities, K.A.M. has had to take S.M.A. to their immigration court hearing all three times. When K.A.M. tries to speak with the judge, S.M.A. yells, tries to get up, or talks about random things, including to the judge, distracting K.A.M. and the judge. During the most recent hearing, S.M.A. had a seizure as they waited for the court. Right after S.M.A. regained consciousness, K.A.M. was forced to enter the room for her immigration hearing. She was so worried about S.M.A. that she could not answer the judge's questions.

**17 & 18. D.G.M. and N.R.R.**

188.   Defendants forcibly sent D.G.M. and his family, including wife N.R.R., to Matamoros, Mexico pursuant to the MPP.

189.   D.G.M. has two heart conditions, including hypertension and a growth on his heart. D.G.M.'s medical conditions cause extreme spikes in his blood pressure that sometimes require hospitalization. These conditions substantially limit major life activities, such as breathing, performing manual tasks, and working, and major bodily functions, such as respiratory and circulatory functions.

190.   On July 26, 2019, Defendants took D.G.M. and his family into custody.

191.   Defendants knew of D.G.M.'s disability because he was hospitalized in custody when his blood pressure spiked dangerously high on July 27, 2019.

192.   Despite D.G.M.'s disability, Defendants subjected D.G.M. and his family in the MPP. When he came back from the hospital, Defendants' employees handed D.G.M. and his family documents in English, even though no one in

D.G.M.'s family is able to read or speak English. Defendants did not read or explain the paperwork or the family's rights. Instead, without explanation, they demanded that the family sign the documents.

193.   D.G.M. pleaded with the agents that he could not go back to Mexico due to his health issues. Instead of providing a process for appeal, or re-determination, the agents returned D.G.M. and his family to Mexico.

194.   In the MPP, D.G.M.'s health continues to worsen. He now regularly has dangerously elevated blood pressure and difficulty breathing. D.G.M. has needed medical attention multiple times. On one occasion, the entire left side of his body went numb and he fainted; nevertheless, the hospital refused to treat him. Given his current heart issues, his doctor has informed D.G.M. that his health is at greater risk of severe complications and possible death from COVID-19.

195.   D.G.M.'s heart conditions interfere with his ability to prepare for his immigration case. Due to the severity of his impairments and limits of treatment, he must monitor and care for his health. Therefore, he cannot devote sufficient efforts to such matters such as gathering information, compiling evidence, filling out documents, and consulting with attorneys.

196.   D.G.M.'s heart conditions interfere with his ability to participate in his immigration case. While in the MPP, D.G.M. and his family have attended five immigration hearings. Each time they attend court, a doctor checks the blood pressure of each family member. D.G.M. often has chest pains on days he has a hearing. The doctor informs D.G.M. each time that, if his blood pressure is too high, he will not be permitted to attend the hearing, and his court hearing will be rescheduled for a later date. As D.G.M.'s health worsens, the chances increase that he will have high blood pressure on a court date and be forced to wait for months longer for the next stage in his proceedings.

197.   N.R.R. is impacted by her husband's disability. She must devote time and energy to caring for D.G.M.'s deteriorating health, leaving her with little time or

CLASS ACTION COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

energy to prepare the entire family's immigration claims. Furthermore, every time they attend court, N.R.R. worries both about her husband's health and that the family's hearing will be re-set due to D.G.M.'s conditions. This distracts her from meaningfully participating in the proceedings.

**19 & 20. H.H.M. and E.H.M.**

198.  Defendants forcibly sent H.H.M., his older sister E.H.M., and his niece to Matamoros, Mexico pursuant to the MPP.

199.  H.H.M. is a twenty-year-old individual who is Deaf. H.H.M. does not know standard sign language, but communicates in "home sign," meaning a sign language that he and E.H.M. have developed together. As a result, H.H.M. relies entirely on his sister to translate what other people say to him and to relay his thoughts to other hearing people. H.H.M. is therefore substantially limited in his ability to communicate. H.H.M.'s Deafness is apparent to anyone who interacts with him.

200.  On or around March 17, 2020, H.H.M., his sister and niece were taken into custody by Defendants.

201.  Defendants knew of H.H.M.'s disability. As they were being taken into custody, one of the agents asked E.H.M. why H.H.M. came to the United States if he could not communicate with anyone.

202.  At the *hielera*, agents separated H.H.M. from E.H.M—the only person with whom he could communicate. E.H.M. explained three times to officers that H.H.M. could not hear or speak and that she was the only person that could communicate with him. One agent responded that, if that was the case, H.H.M. should not have come to the United States, effectively denying E.H.M.'s request for an accommodation. Instead, federal officials kept H.H.M. separated from the sole person with whom he could communicate for days. E.H.M. was extremely worried about her brother the entire time that she was detained.

203.  After about two days, agents decided to place E.H.M. and her daughter, H.H.M.'s niece in the MPP and return them to Mexico. They never permitted H.H.M.

to see his sister or communicate about what was happening prior to forcibly returning E.H.M. to Mexico. E.H.M. was never given an interview or a notification that she had been placed in MPP, let alone a chance to appeal.

204.   Although Defendants knew H.H.M. was deaf, they never provided an interpreter and did not inquire if he had any needs that he could not verbally communicate to them. They never even permitted E.H.M. to be present or translate in any interview.

205.   On information and belief, without using an interpreter to determine H.H.M.'s fears about return to his home country or Mexico, Defendants decided to place H.H.M. in the MPP and forcibly returned him to Mexico. Defendants never provided chance to understand the determination, appeal the decision, or contact a lawyer.

206.   E.H.M. was also forcibly returned to MPP, and was able to find and reunite with H.H.M. because she repeatedly spoke with Mexican immigration officers to see if he had been returned. She found out that H.H.M. had initially been bused to southern Mexico, hours by bus from where E.H.M. was forced to stay. Only after the intervention of private Mexican citizens, the two were able to reunite.

207.   H.H.M. cannot effectively prepare for his immigration proceedings in Matamoros, Mexico. H.H.M. is overwhelmed, stressed, and worried about the dangers and difficulties posed by his disability in Matamoros, ranging from difficulty communicating with aid providers to high risk of being kidnapped. H.H.M. worries that, if anything were to happen to E.H.M., he would be unable to communicate with the world. If H.H.M. were kidnapped—a common occurrence for those Defendant has returned to Mexico—he would not be able to provide even basic information to possible kidnappers for his ransom. Especially with the risks of COVID-19, without E.H.M., H.H.M. will struggle to communicate if he has any medical issues. As his time and energy is focused on survival, he is not able to adequately focus on tasks such as collecting information and preparing documents.

CLASS ACTION COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

208.   After seven months, H.H.M. has not yet had a first immigration court hearing. However, his case is separate from that of his sister. There is no indication that Defendants will provide an interpreter or other effective form of communication as part of that hearing, at the bridge, or in any interactions while he is present in the United States for court. Absent such assistance, H.H.M. will not be able to meaningfully participate in his court hearings and will be denied the opportunity to communicate his fears of returning to his home country or remaining in Mexico.

209.   E.H.M. is constantly worried about her brother. She must constantly stay close to H.H.M. to ensure that he is not attacked or otherwise harmed. In order for him to communicate with anyone, even the humanitarian organizations, she must be present to translate for him. E.H.M. has spent most of her time and energy ensuring that H.H.M. and her child are safe and cared for. She has tried to help with her brother's immigration case, but she is unsure whether she will be able to attend his hearing to translate. Due to the energy that she spends on her brother's care and case, E.H.M. does not have sufficient time or energy to prepare for her own case.

**21. C.J.V.C.**

210.   Defendants forcibly sent a child with disabilities, C.J.V.C, and his mother, to Matamoros, Mexico pursuant to the MPP.

211.   At thirteen-years old, C.J.V.C. was in a major accident and doctors had to amputate his left leg above the knee. As a result, C.J.V.C.'s mobility impairment substantially limits his ability to perform major life activities, including caring for himself, performing manual tasks, walking, standing, lifting, and bending.

212.   In September 2019, Defendants took C.J.V.C. and his mother. M.C., into custody.

213.   Defendants detained them in a *hielera* for about a week. Defendants knew about C.J.V.C.'S disability because M.C. made multiple requests that agents provide C.J.V.C. with medical attention due to pain associated with his amputation. However, agents refused to provide him with any assistance.

214.   Despite C.J.V.C.'s disability, Defendants placed C.J.V.C. and M.C. in the MPP. Neither received interviews. They were never given a chance to understand the determination, appeal the decision, or contact a lawyer. Indeed, neither knew that they would be returned to Mexico until Defendants' employees walked them up to the bridge to Mexico.

215.   Since CBP agents sent them to Mexico, C.J.V.C. and M.C. are forced to live in a crowded shelter with limited access to sufficient food and resources.

216.   C.J.V.C.'s mobility impairments also impact he and his mother's ability to prepare for immigration hearings. For example, C.V.J.C. and M.C. depend on a volunteer lawyer to prepare their case. However, the only lawyer they can find does not have accessible facilities. Therefore, it is difficult for C.V.J.C. to be in a private space to privately consult with the attorney.

217.   C.J.V.C.'s mobility impairments also impact their ability to participate in immigration hearings. It is difficult for C.J.V.C. to travel to hearings. As his only set of crutches are currently broken, M.C. is unsure how they will even make it to court hearings. They have attended court hearings twice in a makeshift tent court. It is dangerous for C.J.V.C. to maneuver the court in his crutches due to uneven floors and inclines. Therefore, M.C. arrives at the hearing only after spending the entire trip worrying about whether her son will be hurt because the trip to and the hearing rooms themselves are inaccessible for him. In one hearing, after expressing her concern for her son, M.C. has broken down crying when trying to discuss her son's disability with the judge, which interferes with her ability to discuss her case.

**22. La.V.S.O.**

218.   Defendants forcibly sent La.V.S.O., a child with disabilities, and her family to Ciudad Juarez, Mexico pursuant to the MPP.

219.   La.V.S.O. has congenital hydrocephalus, which causes a build-up of fluid around her brain and spinal cord and requires continuous, specialized medical treatment. This condition causes her to have to seizures, developmental delay, and

brain damage. These impairments substantially limit major life functions, such as caring for herself and thinking, and major bodily functions, including neurological and brain functions.

220.   In February 2020, Defendants took La.V.S.O., her mother, and her siblings into custody.

221.   Defendants were aware of La.V.S.O.'s disabilities, as her mother, A.A.F.S.O. repeatedly attempted to show La.V.S.O.'s medical documentation to Defendants. Defendants' medical personnel also diagnosed La.V.S.O.'s condition. A doctor placed a bracelet on her showing that she had a special condition. Defendants' agents saw the bracelet and made A.A.F.S.O. remove the medical bracelet. CBP agents knew La.V.S.O. needed medication but threw away both the prescriptions and the medications.

222.   On information or belief, around this time, Defendants decided to place La.V.S.O. and her family in the MPP. They did not receive interviews. The family was never given a chance to understand the determination, appeal the decision, or contact a lawyer.

223.   Instead, after a few weeks in the *hielera*, agents placed the family on a bus. Once boarded, agents told the family that they were going to be sent back to Mexico. They were not given an opportunity to explain why they could not return to Mexico.

224.   La.V.S.O. and her family have twice approached the international bridge in Juarez to try to explain to agents that they cannot be in Mexico. On one occasion, a doctor at the bridge examined La.V.S.O. and determined that she required special medical treatment. Officers still sent the family back to Mexico. Due to their treatment, the children have become so scared of the immigration officers, causing them to beg A.A.F.S.O. not to go to the bridge.

225.   A.A.F.S.O. is forced to live with her children in a crowded shelter with little in the way of precautionary measures to prevent the spread of coronavirus,

CLASS ACTION COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

including to La.V.S.O., who could face dire consequences if infected. Without a support system in Mexico, and due to La.V.S.O.'s medical condition, A.A.F.S.O. must spend a significant amount of time watching over La.V.S.O. and her siblings. A.A.F.S.O. reports that she must keep constant watch over La.V.S.O. for fear that she will fall due to issues with her coordination caused by her brain condition. A.A.F.S.O. is left with little time or energy to focus on activities such as reviewing documents or consulting with her attorney, making her unable to properly prepare for the entire family's immigration case.

### 23. *Plaintiff Al Otro Lado*

226. Al Otro Lado is a binational immigrants' rights advocacy nonprofit organization. Al Otro Lado provides legal orientation and other services to large numbers of migrants at the border between the United States and Mexico, including individuals with disabilities subjected to the MPP. Al Otro Lado advocates for such disabled individuals by giving them legal orientation and, in certain cases, direct representation, as well as by making parole requests on their behalf or otherwise advocating for them to be taken out of the MPP and paroled into the United States. Al Otro Lado was incorporated at 4843 Slauson Ave., Maywood, California 90270-3018, and has offices in Los Angeles, San Diego, and Tijuana.

227. The Defendants' actions in failing to follow the law and their own internal guidelines to exempt the Plaintiffs and their families from MPP has diverted the organization's time and resources. Al Otro Lado has needed to engage workers to assist with social care and provide special assistance for particularly vulnerable individuals who often face more problems in their immigration proceedings because of their vulnerability, whether it is due to inability to obtain or prepare documents, or a higher likelihood of being kidnapped or missing court hearings. This means that Al Otro Lado's ability to carry out its organizational mission to provide assistance to indigent individuals on both sides of the border between Mexico and the United States is undermined by Defendants' placing avoidable obstacles in their path,

CLASS ACTION COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

limiting the amount of time and resources that could otherwise go to serving a wider population better and with more services.

## V.    CLASS ALLEGATIONS

228.   The named Plaintiffs seek certification pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure of the following three classes:

The "*Accardi* class," consisting of all people (1) who have been or will be placed in the Migrant Protection Protocols program, and (2) who have known physical or mental health issues for purposes of the Physical/Mental Health Exclusion;

The "Section 504 class," consisting of all qualified people with a disability under the Rehabilitation Act who have been, or will be, denied meaningful participation in Section 240 proceedings, properly initiated or not, because they are placed in the MPP; and

The "Family Member class," consisting of the members of the family unit of each Section 504 class member, who are also seeking admission from CBP and who are placed in Section 240 proceedings, properly initiated or not.

229.   All three putative classes seek certification of claims for declaratory relief and injunctive relief.

230.   Named Plaintiffs E.A.R.R., G.S.E.R., L.Y.G., H.A.H.G., Y.J.C.E., S.F.L., C.J.M.L., Y.M.M., J.C.M.M., G.F.F., M.Y.J.L., M.M.G., D.Y.S., S.M.A., D.G.M., H.H.M., C.J.V.C., La.V.S.O. are representatives of the *Accardi* and Section 504 classes (the "*Accardi*/Section 504 class representatives") and Named Plaintiffs B.A.E.R., J.A.E.M., N.R.R., and E.H.M. are representatives of the Family Member class (the "Family Member class representatives").

231.   The *Accardi* class, the Section 504 class, and the Family Member class are each so numerous that joinder of all members is impracticable. The exact number of people with disabilities or physical and mental health issues who have, or will be, returned to Mexico pursuant to the MPP is unknown because Defendants do not adequately screen and track such individuals with disabilities. Based on estimates from service organizations that assist asylum-seekers along the U.S.-Mexico border, Plaintiffs reasonably believe there are at least hundreds of individuals in the classes. Plaintiff Al Otro Lado alone currently serves more than forty individuals who are

themselves disabled or seriously ill, approximately, and more than twenty individuals who are family members or care for disabled or seriously ill individuals.

232.    Other factors establish the numerosity requirement, including that the classes consist of numerous individuals who are geographically diverse and who are unlikely to be able to bring individual suits, and that the classes include future, unknowable class members.

233.    There are questions of law and fact common to the members of the *Accardi* Class. Such questions include, but are not limited to:

    a.  Whether Defendants have a policy the Physical/Mental Health Exclusion pursuant to which people with known physical or mental health issues are supposed to be excluded from the MPP and not returned to Mexico;

    b.  What mechanisms, if any, Defendants have in place to ensure that the Physical/Mental Health Exclusion is carried out on the ground;

    c.  Whether people with known physical or mental health issues have been returned to Mexico pursuant to the MPP notwithstanding the Physical/Mental Health Exclusion;

    d.  If so, whether this violates the *Accardi* doctrine; and

    e.  Whether, if members of the *Accardi* class prevail on their claim, the relief should include requiring Defendants to admit members of the family unit of each class member pursuant to the Family Unit Policy and relevant injunctions.

234.    There are questions of law and fact common to the members of the Section 504 class. These questions include, but are not limited to:

    a.  Whether Section 240 proceedings constitute a program or activity of the federal government;

    b.  Whether Section 504 obligates Defendants to put in place practices and procedures to identify members of the Section 504 class, and to assess

CLASS ACTION COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

those people as to the need for accommodations in order to meaningfully participate in Section 240 proceedings;

c. Whether placing members of the Section 504 class in the MPP, and returning them to Mexico, violates DHS regulations by affording such class members an opportunity to participate in or benefit from Section 240 proceedings that is not equal to that afforded to others;

d. Whether placing members of the Section 504 class in the MPP, and returning them to Mexico, violates DHS regulations by providing those class members with a benefit or service that is not as effective in affording equal opportunity to obtain the same result as that provided to others;

e. Whether Defendants violate DHS regulations by utilizing criteria or methods of administration the purpose or effect of which is to subject members of the Section 504 class to discrimination, or that defeat or substantially impair accomplishment of the objectives of Section 240 proceedings;

f. Whether placing members of the Section 504 class in the MPP and returning them to Mexico denies them meaningful participation in Section 240 proceedings; and

g. Whether excluding people with disabilities from the MPP, which would be in keeping with Defendants' Physical/Mental Health Exclusion, constitutes a reasonable accommodation.

235. There are questions of law and fact common to the members of the Family Member Class. Such questions include, but are not limited to:

a. Whether people with an association to a person with a disability, and who are injured based on discrimination against that person with a disability, have a claim under the Rehabilitation Act;

b. Whether family members have been injured based on their association

CLASS ACTION COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

1    with members of the Section 504 class; and

2    c. If so, what is the appropriate relief.

3    236.   Defendants are expected to raise common defenses to the claims of each

4   class, including denying that their actions violate the law.

5    237.   The claims of the *Accardi*/Section 504 class representatives are typical

6   of those of the *Accardi* Class, as each *Accardi*/Section 504 class representative, like

7   each member of the proposed *Accardi* class, has a known physical or mental health

8   issue; each *Accardi*/Section 504 class representative's claim arises from the same

9   policies, practices, or courses of conduct as those of the class; and their claims are

10   based on the same theory of law as the class's claims.

11    238.   The claims of the *Accardi*/Section 504 are typical of those of the Section

12   504 class, as each *Accardi*/Section 504 class representative has a disability for

13   purposes of the Rehabilitation Act; each *Accardi*/Section 504 class representative's

14   claim arises from the same policies, practices, or courses of conduct as those of the

15   class; and their claims are based on the same theory of law as the Section 504 class's

16   claims.

17    239.   The claims of the Family Member class representatives are typical of

18   those of the Family Member class, as each Family Member class representative has

19   an association with a person with a disability; each Family Member class

20   representative's claim arises from the same policies, practices, or courses of conduct

21   as those of the class; and their claims are based on the same theory of law as the

22   Family Member class's claims.

23    240.   The representative Plaintiffs for each putative class are capable of fairly

24   and adequately protecting the interests of the members of each class because the

25   representative Plaintiffs do not have any interests antagonistic to the classes.

26   Plaintiffs, as well as the members of the classes, seek to enjoin the unlawful acts and

27   omissions of Defendants. Finally, Plaintiffs are represented by counsel experienced

28   in civil rights litigation, litigation regarding the rights of detained individuals and

CLASS ACTION COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

individuals with disabilities, working with individuals placed in the MPP, and complex class action litigation.

241.  This action is maintainable as a class action pursuant to Fed. R. Civ. P. 23(b)(2) because Defendants' policies, practices, actions, and omissions that form the basis of this Complaint are common to and apply generally to all members of each putative class, and the injunctive and declaratory relief sought is appropriate and will apply to all members of the respective class(es). Defendants' MPP policies are centrally promulgated, disseminated, and enforced. The injunctive and declaratory relief sought is appropriate and will apply to all members of the respective class(es).

## VI.    CAUSES OF ACTION

### COUNT I
### (Violation of the Administrative Procedure Act/*Accardi* Doctrine on behalf of the *Accardi* class)

242.  All of the foregoing allegations are repeated and realleged as though fully set forth herein.

243.  The APA provides that courts "shall . . . hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), or "without observance of procedure required by law," *id*. § 706(2)(D). The *Accardi* doctrine requires that agencies follow their own regulations, policies, and procedures. *See United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954).

244.  Defendants' Physical/Mental Health Exclusion policy exempts people with known physical or mental health issues from the MPP.

245.  In spite of this, Defendants placed, and continue to place, individuals with known physical or mental health issues in the MPP.

246.  Defendants placed the *Accardi*/Section 504 class representatives in the MPP even though Defendants knew of those representatives' medical issues. For example, Defendants were aware of D.Y.S. and D.G.M.'s medical issues because

CLASS ACTION COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

each of these individuals was hospitalized due to these known medical issues while in Defendants' custody. Regardless, Defendants placed each individual in the MPP shortly after their release from the hospital.

247.    Similarly, Defendants were also aware of other *Accardi*/Section 504 class representatives' various medical issues because each provided Defendants with proof of these medical issues. Plaintiffs presented medical records and prescribed medications, explained their disabilities, and asked for medical attention for their deteriorating condition while in Defendants' custody. Defendants' own medical team corroborated many of Plaintiffs' medical issues and required Defendants to allow the Plaintiffs access to prescribed medications. Despite this, Defendants placed Plaintiffs in the MPP.

248.    By placing the *Accardi*/Section 504 class representatives and members of the *Accardi* class in the MPP, Defendants have violated their own policy, and thus run afoul of the *Accardi* doctrine, by not following their own policy.

249.    As a result, *Accardi*/Section 504 class representatives and members of the *Accardi* class have been injured, and in the absence of judicial relief, this injury is ongoing and will continue.

## COUNT II
### (Violation of the Rehabilitation Act on behalf of the Section 504 class)

250.    All of the foregoing allegations are repeated and realleged as though fully set forth herein.

251.    Section 504 of the Rehabilitation Act ("Section 504") provides that "no otherwise qualified individual with a disability . . . shall, solely by reason of his or her disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under . . . any program or activity conducted by any Executive agency . . . ." 29 U.S.C. § 794(a).

252.    Section 504 requires covered entities to provide reasonable accommodations to qualified disabled individuals so that they can have meaningful access to programs and benefits provided by executive agencies.

CLASS ACTION COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

253.   DHS has promulgated regulations implementing the requirements of Section 504. These regulations prohibit, among other things, DHS and CBP from: affording a qualified individual with a disability an opportunity to participate in or benefit from a benefit or service "that is not equal to that afforded to others;" providing a qualified individual with a disability with a benefit or service "that is not as effective in affording equal opportunity to obtain the same result as that provided to others"; or utilizing criteria or methods of administration the purpose or effect of which would subject qualified individuals with disabilities to discrimination or defeat or substantially impair accomplishment of the objectives of a program or activity." 6 C.F.R. § 15.30.

254.   Section 240 proceedings, and determinations by DHS/CBP as to who will be returned to Mexico pending those proceedings, constitute a program, activity or benefit of the federal government.

255.   Each of the *Accardi*/Section 504 class representatives is a qualified person with a disability for purposes of Section 504.

256.   Defendants have violated Section 504 by returning people with disabilities to Mexico pending or after the conclusion of their Section 240 proceedings, whether or not properly initiated, because doing so: (i) denies people with disabilities meaningful access to those proceedings; (ii) does not afford them with an opportunity to participate in Section 240 proceedings that is equal to that afforded others; (iii) does not provide them with an opportunity to achieve the same result as others; and (iv) utilizes criteria or methods of administration the purpose or effect of which subject qualified individuals with disabilities to discrimination and, thus, defeat or substantially impair accomplishment of the objectives of Section 240 proceedings.

257.   Defendants' actions are also contrary to Defendants' own Physical/Mental Health Exclusion policy.

258.   As a result of Defendants' actions as described herein, members of the

Section 504 class have been, and in the absence of judicial relief will continue to be, injured.

259.    Putting in place mechanisms to ensure that Defendants follows their own Physical/Mental Health Exclusion policy and admit members of the Section 504 class into the United States who are currently in Mexico pursuant to the MPP, and in the future to not return Section 504 class members to Mexico, would constitute a reasonable accommodation, and is otherwise required by Section 504.

260.    Similarly, exempting people with disabilities from the MPP and allowing those currently in Mexico to pursue their Section 240 proceedings from the United States would constitute a reasonable accommodation, and is otherwise required by Section 504.

261.    Further, in accordance with CBP's Family Unit policy, admitting members of the Family Member class, who provide support to Section 504 class members and allow such class members to meaningfully participate in Section 240 proceedings, is also a reasonable accommodation, and is otherwise required by Section 504.

### COUNT III
### (Violation of Rehabilitation Act on behalf of the Family Member class)

262.    All of the foregoing allegations are repeated and realleged as though fully set forth herein.

263.    Each member of the Family Member class has an association with a person with a disability who has suffered discrimination in violation of the Rehabilitation Act, as described above.

264.    As a result of the discrimination suffered by their disabled family member, each member of the Family Member class has been injured because, for example and without limitation, rather than being able to prepare for their own Section 240 proceedings, they have had to focus on assisting and supporting their disabled family member and thus have not been able to meaningfully participate in

1    Section 240 proceedings.

2    265.   If members of the Section 504 class are allowed to pursue their Section

3    240 proceedings from the United States pursuant either to the Rehabilitation Act or

4    in compliance with Defendants' Physical/Mental Health Exclusion policy, any

5    Family Member class member who is forced to remain in Mexico will be unable to

6    assist and support their disabled family member. Furthermore, a disabled family

7    member may be essential to the proper development of a family member's claim,

8    leaving them unable to fully develop their claim if forced to remain in the MPP.   As

9    a result, they will continue to suffer mental trauma and will be unable to meaningfully

10   participate in Section 240 proceedings.

11   266.   In the absence of judicial relief, this injury to Family Member class

12   members is ongoing and will continue.

13   **V.    APPLICATION FOR TEMPORARY RESTRAINING ORDER
        AND INJUNCTIVE RELIEF**

14

15   267.   Plaintiffs intend to file an Application for Temporary Restraining Order

16   and Injunctive Relief and Brief in Support, requesting that the court provide relief

17   consistent with the claims set forth above.

18                           **PRAYER FOR RELIEF**

19   Plaintiffs respectfully request that the Court enter a judgment against

20   Defendants and award the following relief:

21   1.   Issue a temporary restraining order, pending a hearing on the request for a

22         preliminary injunction, that provides relief that will be identified in Plaintiffs'

23         briefing and will be consistent with the claims set forth above;

24   2.   Declare that the suit is maintainable as a class action pursuant to Federal Rule

25         of Civil Procedure 23(a) and 23(b)(2);

26   3.   Adjudge and declare that the acts, omissions, policies, and practices of

27         Defendants, and their agents, employees and officials, described herein, are in

28         violation of the rights of Plaintiffs and the class members they seek to represent

CLASS ACTION COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

under the Rehabilitation Act, and the Administrative Procedure Act/*Accardi* doctrine;

4.    Preliminarily and permanently enjoin Defendants, their agents, employees, and officials from subjecting Plaintiffs and the class members they seek to represent to the illegal and unconstitutional conditions, acts, omissions, policies, and practices set forth above;

5.    Issue an injunction requiring Defendants, without limitation, to: stop subjecting members of the *Accardi* class to the MPP, and to put in place mechanisms to ensure that their Physical/Mental Health Exclusion policy is carried out on the ground; to admit family members of *Accardi* class members pursuant to the Family Unit Policy; put in place practices and policies to identify immigrants with disabilities, and to assess those immigrants for accommodations necessary to meaningfully prepare for and participate in Section 240 proceedings from the United States; as part of this accommodations assessment process, determine whether the immigrant with a disability and their families should be admitted into the United States to pursue their Section 240 proceedings, either as an accommodation or in compliance with Defendants' Physical/Mental Health Exclusion policy;

6.    Require Defendants to pay Plaintiff's reasonable attorneys' fees and costs, pursuant to 29 U.S.C. § 794(a)(b) and 28 U.S.C. § 2412(d); and

7.    Grant all other relief that is just and proper.

Date:  November 2, 2020                    Respectfully Submitted,

_/s/ Robert S. Shwarts_
ROBERT S. SHWARTS (SBN 196803)
rshwarts@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
The Orrick Building
405 Howard Street
San Francisco, CA 94105-2669
Telephone:  (415) 773-5700
Facsimile:  (415) 773-5759

LILLIAN J. MAO (SBN 267410)
lmao@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
1000 Marsh Road
Menlo Park, California 94025-1015
Telephone:  (650) 614-7400
Facsimile:  (650) 614-7401

TIMOTHY P. FOX (SBN 157750)
tfox@creeclaw.org
CIVIL RIGHTS EDUCATION AND
ENFORCEMENT CENTER
1245 E. Colfax Avenue, Suite 400
Denver, CO 80218
Telephone:  (303) 757-7901
Facsimile: (303) 872-9072

MARIA DEL PILAR GONZALEZ MORALES
(SBN 308550)
pgonzalez@creeclaw.org
CIVIL RIGHTS EDUCATION AND
ENFORCEMENT CENTER
1825 N. Vermont Avenue, #27916
Los Angeles, CA 90027
Telephone:  (805) 813-8896
Facsimile: (303) 872-9072

_Counsel for Plaintiffs_

Of Counsel:

ERIN D. THORN* (TX SBN 24093261)
erin@texascivilrightsproject.org
EFREN C. OLIVARES* (TX SBN 24065844)
efren@texascivilrightsproject.org
KARLA M. VARGAS* (TX SBN 24076748)
kvargas@texascivilrightsproject.org
MIMI MARZIANI* (TX SBN 24091906)
mimi@texascivilrightsproject.org
CAROLYN O'CONNOR* (CT SBN 441082)
carrie@texascivilrightsproject.org
TEXAS CIVIL RIGHTS PROJECT

56

CLASS ACTION COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

1017 W. Hackberry Ave.
Alamo, Texas 78516
Telephone: 956-787-8171, ext. 127
Facsimile: 956-787-6348

*Pro hac vice* application forthcoming

CLASS ACTION COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF